## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| |
|---|
| MR. AND MRS. "A.", PARENTS OF "Z.A." A MINOR WITH DISABILITIES <br><br>            Plaintiffs, <br><br>    v. <br><br> THE GREENWICH BOARD OF EDUCATION, <br><br>            Defendants. |

3:15-cv-00203 (CSH)

## RULING ON PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

HAIGHT, Senior District Judge:

Plaintiffs, Mr. and Mrs. A (together, "Parents"), parents of Z.A. ("the "Student"), bring this action against Defendant Greenwich Board of Education ("the Board"). Parents bring suit pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482 ("IDEA"), to appeal a decision and order (the "Order") of an independent hearing officer (the "IHO") of the State of Connecticut's Department of Education. Specifically, Parents filed suit under § 1415(i)(2) of the IDEA, which grants the right to bring a federal civil action to certain parties claiming to have been aggrieved by the IDEA's dispute resolution process. The parties have cross-moved for summary judgment. Docs. 25-29, 33. This Ruling resolves both motions.

## I.  Background

Z.A. is a fifteen-year old student at the Eagle Hill School ("Eagle Hill") in Greenwich, CT, a special education facility as determined by the Connecticut State Department of Education. Z.A. first matriculated at Eagle Hill for the 2013-14 school year following Parents' decision to move the family from New York City to Greenwich in 2013. Z.A. had spent the previous four academic years

at the Summit School ("Summit") in New York City, which is also a private school designed for students with special educational needs.  Parents' decision to send Z.A. to Eagle Hill, rather than a public school within the Greenwich Public School ("GPS") system and under the jurisdiction of the Defendant Board, is the focus of the instant dispute.

Parents initially became concerned about Z.A.'s abilities while Z.A. was in preschool.  Mrs. A. Tr. (7/24/14) at 49.[1]  Parents retained Dr. Ellen A. Farber to conduct an evaluation of Z.A. in February 2006, when Z.A. was five and a half years old.  B-5, at 1.  Dr. Farber summarized the results:

> During that evaluation, [Z.A.] demonstrated average intellectual abilities with impoverished language.  He tired quickly and became frustrated. On language measures he had difficulty interpreting spoken sentences when the language increased in structural complexity and in idea density.

B-5, at 1.  In light of these difficulties, Parents decided to send Z.A. to Manhattan Country School, a private school in New York City.  Dr. Farber conducted further psychological evaluation of Z.A. in December 2007 and March 2008, specifically diagnosing Z.A. with "mixed receptive-expressive language disorder," and determining that he "meets criteria for a diagnosis of learning disability in the areas of processing speed, graphomotor coordination, and expressive writing."  B-5, at 7.  Dr. Farber further stated that Z.A. "needs to be in a school for children with language and learning disabilities."  B-5, at 7.

While attending the Manhattan Country School Z.A. began to struggle socially, which

---

[1]  Citations to "Tr." refer to the transcripts of proceedings in front of the IHO.  Citations to "B-[]," "P-[]," and "HO-[]" are to the Board's, Parents', and Hearing Officer's respective exhibits at the due process hearing.  All exhibits and transcripts were filed under seal.  *See* Doc. 36.

concerned Parents enough to enroll Z.A in New York City public school for second-grade for the 2008-09 school year.  Mrs. A. Tr. (7/24/14) at 51.  In fact, Parents removed Z.A. from the Manhattan Country School after a safety issue arose during Z.A.'s first day of second grade.  *Id.*; B-6, at 1 ("He left Manhattan [Country School] abruptly after the first day of his third year there when his mother, who attended a school picnic with him, saw how cruelly he was being picked on by the other boys").  However, Parents were unsatisfied with Z.A.'s experience in New York City public school because Z.A. "just couldn't get consistency of support." *Id.*  On the recommendation of Dr. Farber, Parents chose to send Z.A. to Summit in New York City for third grade during the 2009-10 academic year.  Payment for the Summit tuition was paid for by the New York City Department of Education and the New York State Education Department in light of their finding that Z.A. was disabled pursuant to the IDEA and that the New York City Department of Education "is not able to provide the special education services recommended for [Z.A.]."  P-20.

At some point in 2010, Z.A. began to visit board certified psychiatrist Dr. Roger Rahtz, who has since then continuously and regularly treated Z.A.  Dr. Rahtz Tr. (9/4/14) at 6; Mrs. A. Tr. (7/24/14) at 66-67.  Additionally, in August of 2011, Parents retained the services of Dr. Andrew Morrel to conduct another psychological evaluation of Z.A.  B-6.  Ultimately, Dr. Morrel's summary of Z.A. was as follows:

> [Z.A.] is a boy of superior intellectual ability who was only intermittently able to function at the level of his potential owing to his uneven attention, motivation and frustration tolerance[.] His greatest cognitive strengths lie in his reasoning and his visual spatial problem-solving abilities, while relevant vulnerabilities were noted in his expressive language, his graphomotor facility and his attentional/executive skills.

B-6, at 8.

Z.A. attended Summit for the third through sixth grades, spanning the academic years of 2009-10, 2010-11, 2011-12, and 2012-13.  Present in the record are two Individual Education Plans ("IEPs") crafted by the New York Committee on Special Education that were created while Z.A. was at Summit.  One, dated March 6, 2012, was operative for Z.A.'s sixth-grade year at Summit during 2012-13.  The second, dated May 24, 2013, was to be operative for Z.A.'s seventh-grade year during 2013-14.[2]  These IEPs, fifteen and seventeen pages respectively, contain detailed information including, but not limited to, Z.A.'s then present level of performance and needs, specific annual goals, and recommended special educational programs and services.  B-1; B-2.  The latter consists of: (i) a special education class with a staffing ratio maximum of 12:1:1.5[3]; (ii) speech-language therapy twice per week for thirty minutes; (iii) occupational therapy twice per week for thirty minutes; (iv) individual occupational therapy once per week for thirty minutes; and (v) group occupational therapy once per week for thirty minutes.  B-1, at 9-10; B-2, at 11.  The May 2013 IEP also stated that Z.A.'s "[p]rogram setting precludes participation" in "regular class, extracurricular and other nonacademic activities."  B-2, at 14.  It also stated that Z.A. requires a "specialized school '12:1+1,' because "[Z.A.] requires a highly specialized program with support services not available in public school to meet his educational needs."  B-2, at 16.

Z.A.'s May 2013 IEP, created for implementation during the following 2013-14 school year, would not go into effect at Summit because at this time Parents were planning to move the family from New York City to Greenwich.  Parents decided to move for several reasons, one related to the

---

[2]  The record contains no IEPs—or references thereto—related to Z.A.'s third, fourth, or fifth grade years.

[3]  According to Parents, "this meant that there would be no more than twelve students in the classroom with two or three adults."  Doc. 27 ¶ 19.

struggles and stresses faced by Z.A. in New York City generally and at Summit specifically, but also due to adverse changes in Mr. A.'s employment situation.

Parents had been planning to move to Greenwich for some time, and had owned a house in the town since 2002.  Mrs. A. Tr. (10/21/14) at 31.  One reason Parents decided on Greenwich was the quality of the school system.  *Id.*  At some point in 2012, Mrs. A. toured Greenwich's Central Middle School ("CMS"), the school which Z.A. would have attended if he were to attend a school under the Board's jurisdiction.  *Id.* at 31-2.  Mrs. A testified that she toured CMS with the intention that Z.A. would eventually attend school there.  *Id.*  Around this time, however, Parents were also considering Eagle Hill, which was recommended to them by Dr. Morrel when Z.A. was initially struggling at Summit.  Mrs. A. Tr. (7/24/14) at 52.  At some point in 2012, Mrs. A. even called Eagle Hill, but never followed up.  *Id.* at 52-53.

Once Mr. A.'s financial setback occurred near the end of that year, 2012—or, as testified to by Mrs. A., once "all hell broke loose"—Parents began to consider moving in earnest, and Eagle Hill came up again.  *Id.* at 53.  In February of 2013, Z.A. and Mrs. A. took a tour of Eagle Hill, with Z.A. taking part in an interview the same day.  Shortly thereafter,[4] Z.A. was accepted by Eagle Hill for the 2013-14 school year.  Mrs. A. Tr. (10/21/14) at 36.  On March 12, 2013, Parents paid a $6,075 deposit to Eagle Hill, securing Z.A.'s enrollment at the school for the 2013-14 academic year.  The contract signed by Mrs. A. stated that she would be required to pay the entire year's tuition of $60,750 if she were to withdraw Z.A. after June 1, 2013.  Mrs. A. testified that she was willing to risk forfeiting that

---

[4]  Mrs. A. could not recall the exact date.  Mrs. A. Tr. (10/21/14) at 36.

entire payment if Z.A. were not to attend Eagle Hill.[5]  *Id.* at 41.

On May 28, 2013, Z.A. had his first of four evaluation sessions with Dr. Timothy Heitzman, a pediatric neuropsychologist at the Southfield Center for Development in Darien, CT.  B-7.  One of the principal reasons that Parents obtained the services of Dr. Heitzman was to "help them to find an appropriate school placement for [Z.A.]."  B-7, at 1.  Z.A. met again with Dr. Heitzman on June 4, June 5, and June 7, 2013.  Ultimately, Dr. Heitzman issued a Neuropsychological Evaluation of Z.A., dated August 14, 2013.  B-7.

During the first week of June 2013, Parents closed on their new house and physically relocated to Greenwich.  Parents thereafter registered Z.A. at CMS on June 7, 2013.  Parents did so even though, as discussed, Z.A. was at the time enrolled at Eagle Hill and the June 1, 2013 date had passed by which they were contractually obligated to pay Eagle Hill the entire 2013-14 academic year's $60,750 tuition.  Also on June 7, 2013, Mrs. A. took a short tour of CMS, led by CMS guidance counselor Colleen Alfano.  Mrs. A. did not bring Z.A. on this visit to CMS.  Z.A. was in school that day at Summit, where he was set to finish the 2012-13 academic year.  Mrs. A. Tr. (10/12/14) at 43.[6]  Mrs. A. did not have a positive reaction to what she saw on the tour of CMS.  She testified that although "it looked like a nice school, . . . it was not going to be appropriate for [Z.A.]."  Mrs. A. Tr.

---

[5]  In fact, Mrs. A. testified that she had to do just that with the entire $20,000 tuition for the Z.A.'s second-grade year at Manhattan Country School where Z.A. unenrolled after the first day.  Mrs. A. Tr. (10/21/14) at 40.

[6]  The Board attempts to discredit Mrs. A. by pointing out that although Z.A. was in school at Summit in New York on June 7, 2013, he also came to Darien, CT that same day to meet with Dr. Heitzman yet Mrs. A. did not bring him to CMS (per Google Maps, Dr. Heitzman's office at the Southfield Center for Development is just 11.2 miles from Central Middle School).  This is an unfair criticism.  Given that Z.A. spent the day in New York City, and then afterwards traveled to Darien for his session with Dr. Heitzman, Z.A. would likely only have been available at night to visit CMS.  A night visit to CMS would have been of little value.

(7/24/14) at 58.  She specifically identified "the bustling in the hallways, the sounds, the sensory experience," as well as "[m]ultiple people in the classrooms, large class sizes, lots of voices, the acoustics, the smells." *Id.* at 58; Mrs. A. Tr. (10/21/14) at 8.

At some point after June 7, 2013, Parents requested that the Defendant Board convene a Placement and Planning Team ("PPT") to create an IEP for Z.A.  Prior to the PPT meeting, Parents provided to the Board the Summit New York IEPs from March 6, 2012 and May 24, 2013, as well as the 2008 report of Dr. Farber and the 2011 report of Dr. Morrel.  Parents did not inform the Board that they had already enrolled Z.A. at Eagle Hill, or that they were even considering a private placement for Z.A.  Parents also did not inform the Board that Z.A. had just a few weeks prior spent four sessions with Dr. Heitzman or that Dr. Heitzman would soon be issuing a comprehensive neuropsychological evaluative report.  This is despite the fact that the express purpose of that report was to assist with finding a proper school placement for Z.A.

The Board convened the PPT meeting on June 26, 2013.  Present at the meeting were:  (i) Assistant Principal Dr. Jo Frame, the administrator of the PPT; (ii) special education teacher Carolyn Hoette; (iii) general education teacher Kevin Krois; (iv) school psychologist Dr. Scott McCarthy; (v) speech/language pathologist Julie Webster; (vi) guidance counselor Colleen Alfano; and (vii) Mrs. A.  Sherri Bordoff, the Clinical Director at Summit, also participated by telephone.

The PPT determined that Z.A. was disabled, specifically, that he suffered from an "Emotional Disturbance." B-3, at 2.  The PPT therefore determined that Z.A. was "[e]ligible as a student in need of Special Education," and that "[t]he child is evaluated as having a disability, and needs special education and related services." B-3, at 2.  However, the PPT did not create an IEP for Z.A.  Rather, "[t]he team agreed to a diagnostic placement," pursuant to which Z.A. would be enrolled at CMS and

evaluated during the beginning of the school year, prior to the school creating and implementing an IEP. B-3, at 2. The PPT determined the goals of the diagnostic placement to be three-fold: (i) "gather current level of academic, cognitive behavior need"; (ii) "provide education in [least restrictive environment] available to best suit [Z.A.]'s needs"; and (iii) "draft a new IEP for the 2013-2014 school year." B-3, at 4. The specific services to be provided during the diagnostic placement were to be: (i) daily 45 minute collaborative group meetings with a special education academic monitor, Carolyn Hoette; (ii) weekly 45 minute meetings with Julie Webster, CMS's speech/language pathologist; and (iii) weekly 45 minute counseling meetings with school psychologist Dr. Scott McCarthy. A PPT was to be convened every two weeks between the start of the school year and October 8, 2013 to address Z.A.'s progress through the diagnostic placement. The diagnostic placement made no reference to Z.A.'s Summit IEP, nor the contents thereof.

Alfano testified that the purpose of the diagnostic placement in the mainstream setting accompanied with bi-weekly meetings was so that the school could "repeatedly review whether or not [Z.A.] was in the least restrictive environment and his needs were being met." Alfano Tr. (9/11/14) at 62. She also testified that the diagnostic placement is

> a very intentional period of data collection and sharing and reviewing of the student's progress and placement and support services in order to collaboratively determine whether or not the student is in an appropriate placement.

*Id.* at 66. The purpose of collecting that data was to form a baseline from which the PPT could ultimately create an IEP. Hoette Tr. (10/17/14) at 132-33.

CMS school psychologist and PPT member Dr. Scott McCarthy testified why he thought that a diagnostic placement was most appropriate for Z.A.:

> I think the biggest questions were regarding behavioral responses to

> things. How would [Z.A.] do in a mainstream setting, with a
> mainstream teacher and a collaborative teacher. Would he be able to
> access the academic curriculum within that setting, and what level of
> support would he require.

Dr. McCarthy Tr. (10/27/14) at 71; *see id.* at 15 ("our focus was on providing the services within

Central Middle School"). Dr. McCarthy also stated: "the purpose of a diagnostic placement was to

determine whether the goals that had been developed in that May [Summit] IEP could be accessed

. . . with the services that we were providing." Dr. McCarthy Tr. (10/21/14) at 109. Alfano testified

that a motivation for the diagnostic placement at CMS was that "Ms. [A] expressed that [Z.A.] wanted

to be in typical mainstream classes and wanted to not feel different and separate. And we considered

that." Alfano Tr. (9/11/14) at 67; *see also* Dr. McCarthy Tr. (10/27/14) at 15 ("the people who knew

him best were saying that a mainstream setting was going to be the most appropriate for him"); *but*

*see* Dr. Rahtz Tr. (9/4/14) at 33 ("I believe that the possibility of [Z.A.] being in a mainstream setting

[in June 2013] would have significant disadvantages").

In addition to the goal of the diagnostic placement—to gain data on how Z.A. would perform

during the regular-year mainstream program—PPT members made an offer at the PPT meeting to

visit Z.A. over the summer, either at home or at Z.A.'s summer camp.[7] The parties describe Mrs. A.'s

response to these offers in contrasting fashions. Dr. McCarthy testified that Mrs. A. "declined" this

offer. Dr. McCarthy Tr. (10/21/14) at 111. Hoette testified that she did not "know exactly . . . why

we didn't go to his summer camp." Hoette Tr. (10/27/14) at 87. However, at the due process hearing,

Parents' counsel played a recording of the PPT meeting in which Mrs. A. stated "I love the idea," but

---

[7] There is a dispute in the record as to whether the Board offered to visit Z.A. at summer camp. Mrs. A. testified that she does not remember such being offered. Mrs. A. Tr. (10/21/14) at 61. Dr. McCarthy and Hoette both testified that it was offered. Dr. McCarthy Tr. (10/21/14) at 111; Hoette Tr. (10/27/14) at 10.

that she had to "ask [Z.A.'s] psychiatrist" first.  Dr. McCarthy Tr. (10/27/14) at 11.  Nothing in the

record shows that either party followed up on the Board's request to observe Z.A. over the summer.

The IHO characterized this exchange as Mrs. A. providing a "noncommittal response to the school

psychologist and special education teacher's request to observe the Student over the summer."  Doc.

29-1, at 7-8.[8]

    Mrs. A. did not sign the consent form as to the diagnostic placement, stating that she wanted

to take it home and discuss it with Mr. A. first.  Doc. 27 ¶ 33; Alfano Tr. (9/11/14) at 50.  However,

Mrs. A did sign an authorization form allowing GPS to obtain information from Dr. Rahtz.[9]  After

Mr. and Mrs. A. subsequently discussed the PPT's proposed diagnostic placement, they became

convinced it was not an appropriate way forward for Z.A.  Mrs. A testified that "it seemed like we

would be starting from scratch, as opposed to continuing support off of the Summit experience," and

that "what was being proposed was more of a trial and error let's get to know him, and I think that's

well meaning, and I understand it, but I didn't think it was appropriate for [Z.A.] in light of where he

was."  Mrs. A. Tr. (10/8/14) at 95-96.  On June 30, 2016, Mrs. A. e-mailed Dr. Frame the following:

---

    [8]  There is also a dispute as to whether the Board offered for Z.A. to attend CMS's
summer school program.  Mrs. A. testified definitively that the PPT did not offer Z.A. summer
services.  Mrs. A. Tr. (10/8/14) at 94.  Hoette testified in some detail as to an exchange during
the PPT meeting in which the Board offered summer school and Z.A.'s mother refused on the
basis that Z.A. was set to attend summer camp.  Hoette Tr. (10/27/14) at 86-87, 91.  Dr.
McCarthy, for his part, testified that he "think[s] summer school was offered," but agreed that the
PPT minutes made no mention of such an offer and that "[i]t should be" in that document if it
was offered.  Dr. McCarthy Tr. (10/27/14) at 24.  The IHO makes no reference at all to an offer
of summer school in her order, and so there is no agency finding to which the Court can defer on
this factual issue.  Given Dr. McCarthy's testimony that such an offer should have been in the
PPT document if made, and the importance the IDEA places on such documents, the Court must
presume that no offer to attend summer school was made.

    [9]  The Greenwich school system never contacted Dr. Rahtz.  Dr. Rahtz Tr. (9/4/14) at 16;
see also Dr. McCarthy Tr. (10/27/14) at 18 ("Q: You, as the school psychologist, did not make
any attempt to contact [Z.A.]'s psychologist, did you?  A: I did not.").

> My husband and I are very concerned that a diagnostic placement, in particular, the one identified in the document you provided to us at the PPT meeting is not an appropriate placement for [Z.A.]. [Z.A.] cannot enter Greenwich Public Schools in the fall without an appropriate program in place.
>
> As you know from the information we and The Summit School provided at the PPT meeting, [Z.A.] has been in a 12:1 specialized out of district placement for the last several years.  Even in such a restrictive placement, he has struggled to make educational progress.

B-9, at 2.

On July 10, 2013, Dr. Frame responded to Mrs. A.'s June 30 e-mail—after first contacting the GPS special education department[10]—and stated that the Board "would be happy to conduct another PPT meeting to try to address your concerns.  Please call the school to schedule a meeting."  B-9, at 3.  Mrs. A. responded by e-mail the following day, July 11, 2013, stating as follows:

> Given that [Z.A.] had such a difficult year, we decided to have him evaluated again.  Dr. Tim Heitzman of the Southfield Center in Darien is working on the evaluation and I'd like him to attend the PPT meeting.  Dr. Heitzman is currently on vacation but I think he will be back in another week and should have availability late July so I'll be trying to coordinate around that timing.

B-9, at 3.  This is the first time that Parents notified anyone at GPS that they were obtaining an evaluation from Dr. Heitzman.  This is despite the fact that Dr. Heitzman had already met with Z.A. four times, with the ultimate meeting having taken place more than a month prior to Mrs. A.'s July 11 e-mail.

At some point between Mrs. A.'s July 11, 2013 e-mail and August 1, 2013, CMS Assistant Principal Mabee learned that Z.A. was enrolled at Eagle Hill for the upcoming school year.  Mabee

---

[10]  Specifically, Dr. Frame contacted Mary Forde and Jeffrey Libby, stating as follows: "I don't know what to do with this.  This child appears to have many issues, but I was told to put him on diagnostic placement.  How should we proceed?"  B-9, at 2.

learned this not through Parents, but when Eagle Hill contacted CMS about arranging transportation for Z.A. to Eagle Hill for the 2013-14 academic year.  On an August 1, 2013 telephone call, Mabee informed Parents that she learned Z.A. had been enrolled at Eagle Hill.  B-12.  It was Parents' unrebutted understanding that, during that call, GPS, through Mabee, expressed its intent not to schedule a second PPT in light of Z.A.'s Eagle Hill enrollment.  B-12.

In a letter dated August 9, 2013, Parents gave notice to the Board that they were "privately placing [Z.A.] at Eagle Hill School," and that they "will be seeking tuition reimbursement and related expenses from the Greenwich School Board."  B-10.[11]  Parents' letter reiterated the objections they raised in their July 11, 2013 e-mail as to the diagnostic placement that arose from the June 26, 2013 PPT.  The letter makes no reference to the Board's offer to conduct a subsequent PPT.  Nor does it update the Board on the status of the Heitzman evaluation—the pending nature of which Parents relied on to delay the scheduling of a second PPT—which Mrs. A. had indicated would be prepared by the end of July.

On August 16, 2013, Parents transmitted via e-mail the completed Heitzman report to Dr. Frame.[12]  B-12.  The e-mail also indicated that Parents were under the impression that the Board was not planning on holding a second PPT in light of Z.A.'s enrollment at Eagle Hill.  B-12.  Parents again reiterated their view that the diagnostic placement offered at the June 26, 2013 PPT was inappropriate, and that "we needed to make certain that [Z.A.] had an appropriate educational placement for the start of the 2013-2014 school year."  B-12.  The e-mail concludes by stating that

---

[11]  The Board did not receive the letter until August 12, 2013.  However, it is not disputed that Parents provided more than the ten days notice that they were required to give pursuant to 20 U.S.C. § 1412(a)(10)(C)(iii).

[12]  The letter states that Parents "had hoped to have his report sooner but [Dr. Heitzman] was on personal leave for most of July."  B-12.

"[i]f GPS had offered an appropriate program, we would have gladly considered it."  B-12.

The Board responded to the Parents' August 9, 2013 letter on August 19, 2013.  B-11.  The Board expressed the school's desire to conduct another PPT and told Parents to contact the school regarding its scheduling.  The letter also provided details as to how Z.A. could formally withdraw from CMS.  On August 27, 2013, Parents contacted GPS indicating their desire to schedule a follow-up PPT.  P-8.  August 27, 2013 was also the first day of school at CMS.  HO-2 ¶ 21.

A second PPT was convened on September 17, 2013, after Z.A. had begun classes at Eagle Hill.  Present at this PPT were: (i) Mabee, the PPT administrator; (ii) regular education teacher Dr. Frame; (iii) special education teacher Hoette; (iv) school psychologist Dr. McCarthy; (v) speech/language pathologist Webster; (vi) program coordinator Jeffrey Libby; and (vii) Mrs. A.  Z.A.'s psychologist, Dr. Rahtz, participated by telephone.  In light of the additional findings in the Heitzman report, the PPT agreed that additional services were warranted beyond those called for in the first PPT.  *See* Dr. McCarthy Tr. (10/21/14) at 116 ("this 2013 report was very, very different and suggested that [Z.A.] needed a small instruction and highly supported setting").  However, like the first PPT, this PPT also did not culminate in an IEP, but again in a diagnostic placement.  This was despite Dr. Rahtz's statement at the meeting that a diagnostic placement was not appropriate for Z.A.  Dr. Rahtz Tr. (9/4/14) at 48-49 ("the placement even for a relatively short time . . . in a mainstream setting would be deleterious to [Z.A.]'s self-esteem").  Although the PPT again did not incorporate Z.A.'s Summit IEP, it did dictate that "[t]he team will implement the Summit School IEP goals, 5/24/2013, during the Diagnostic Placement."  B-4, at 2.  This diagnostic placement would be similar in nature to the one called for during the first IEP, with the addition of: (i) a daily check-in service for Z.A.; (ii) paraprofessional support; (iii) a once weekly social skills group; (iv) a once weekly small

group speech session; (v) twice weekly occupational therapy; and (vi) a BCBA consultation during the diagnostic placement.[13]  Like the initially offered diagnostic placement, Z.A. would receive his general educational services as part of CMS's "mainstream" curriculum.

Parents received the diagnostic placement plan emanating from the second PPT on September 28, 2013.  On October 3, 2013, they wrote as follows in response:

> My husband and I are confused as to why the PPT didn't offer this placement back in June since it is merely a transfer of the services set forth in the Summit IEP we provided to the PPT at the June meeting. Also, a Summit representative attended the June PPT by telephone to provide additional information.  There is much more to his individualized education program and his unique educational needs than service hours.
>
> We are rejecting the Diagnostic Placement Plan because it is not appropriate for Zachary.

P-11.  Mrs. A. testified as to the deficiencies she saw in the diagnostic placement, such as too large of a class size, insufficient student-to-teacher ratio, lack of structure throughout the entire day, including lunch, the lack of appropriate emotional support from properly trained individuals, as well as the lack of having one point person formally assigned to Z.A.  Mrs. A. Tr. (10/8/14) at 108-11, (10/21/14) at 6-8.

On May 2, 2014, Parents petitioned for a due process hearing to challenge the Board's diagnostic placement approach with respect to Z.A.  After a failed attempt at mediation, the parties scheduled a hearing in front of the IHO.  The hearing extended over seven days, on July 24, September 4, September 11, October 8, October 14, October 27, and November 24, 2014.  Testifying

---

[13]  The additional services were documented in a chart created by Hoette.  B-4, at 6.  This chart compared the services (i) Z.A. received at Summit; (ii) Z.A. would have received pursuant to the June 26, 2013 PPT; and (iii) those services being offered through the September 17, 2013 PPT.

at the hearing were: (i) Mrs. A; (ii) Dr. Rahtz; (iii) Rosenberg; (iv) Alfano; (v) Dr. McCarthy; (vi) Hoette; (vii) Mabee; and (viii) Dr. Frame.  The issues for resolution were: (i) "Did the Board offer an appropriate program to Student by requesting a Diagnostic Placement?"; (ii) Did the Board have sufficient information to develop an [IEP] for Student?"; (iii) "Is Eagle Hill School an appropriate placement for Student?"; and (iv) "If Eagle Hill is an appropriate placement for Student, should the Parents be reimbursed for the costs of tuition and education related expenses?"  The parties submitted post-hearing briefing on December 10, 2014.

On December 30, 2014, the IHO issued her decision, ruling in favor of the Board.  In summary, the IHO determined that: (i) the diagnostic placement was appropriate; (ii) the Board lacked sufficient information to develop an IEP for Z.A. in the mainstream setting; and (iii) in light of those findings, it was unnecessary to address the issues as to Eagle Hill.  Parents filed the instant action challenging the IHO's determination on February 13, 2015.

## II.    Standard of Review

IDEA appeals are generally resolved in full via cross-motions for summary judgment brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  However,

> Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment motion. . . .  Basing its decision on the preponderance of the evidence, the court is required to grant such relief as the court determines is appropriate.

*M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012) (internal quotations, citations, and alterations omitted).  The "preponderance of the evidence" standard comes directly from the IDEA itself.  20 U.S.C. § 1415(c)(2) ("basing its decision on the preponderance of the evidence, [the district court] shall grant such relief as the court determines is appropriate").  Accordingly, "'a motion for

summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the motion serves a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA.'" *Id.* at 225-26 (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

Finally, in determining whether a state agency's decision as to a local education agency's compliance with the IDEA is supported by a preponderance of the evidence, the court should keep in mind that

> '[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.'  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112-13 (2d Cir. 2007) (internal quotation marks omitted).  The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) (internal quotation marks, ellipses, and brackets omitted).  The deference owed depends on both the quality of the opinion and the court's institutional competence.  *Id.*

*C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014).

## III.   Discussion

### A.   *Burlington/Carter*

The process of review of a state agency's determination as to parents' entitlement to reimbursement for a private placement under the IDEA is a familiar one:

> When parents unilaterally enroll their child in a private school, we apply the three-part *Burlington-Carter* test to determine whether they should be reimbursed.  Under the test, we look at '(1) whether the school district's proposed plan will provide the child with a free appropriate public education [("FAPE")]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities.'

*J.C. v. New York City Dep't of Educ.*, – F. App'x –, 2016 WL 1040160 (2d Cir. Mar. 16, 2016)

(quoting *C.F.*, 746 F.3d at 73).[14]  The Court turns to the *Burlington/Carter* elements as they apply to the case at bar.

### 1.     IHO's Determination That the Board Offered Z.A. a FAPE

"A state receiving federal funds under the IDEA must provide disabled children with a free and appropriate public education ("FAPE")."  *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174-75 (2d Cir. 2012); 34 C.F.R. § 300.101(a) (a FAPE "must be available to all children residing in the State between the ages of 3 and 21").  The "centerpiece" of the provision of a FAPE is "'the individualized education program,' or 'IEP.'" *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)); *see also R.E.*, 694 F.3d at 186 ("the adequacy of the IEP . . . creates considerable reliance interests for the parents").  An IEP "is a written statement that sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *M.H.*, 685 F.3d at 224.  Given the centrality of the IEP to the IDEA scheme, "[a]t the beginning of each school year, each public agency must have in effect, for each child with a disability within its jurisdiction, an IEP, as defined in § 300.320." 34 C.F.R. § 300.323(a); *K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, 2012 WL 4017822, at *16 (S.D.N.Y. Aug. 23, 2012) ("The IDEA . . . requires that a school district have an IEP in effect at the *beginning* of the applicable school year.").  Where a school board fails to have an IEP in effect for a disabled child at the beginning of the school year, the board fails to offer that student a FAPE.

---

[14]  The Second Circuit's phrase "*Burlington-Carter* test" refers to the Supreme Court decisions in *School Committee of Burlington v. Department of Education*, 471 U.S. 359 (1985) and *Florence County School District Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993).  *See Frank G. v. Board of Educ. of N.Y.*, 459 F.3d 356, 363-64 (2d Cir. 2006).

*See Doe v. East Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015) ("'[W]hen a child requires special-education services, a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under the IDEA as a failure to provide an adequate IEP'" (quoting *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 238-389 (2009)).

Here, it is undisputed that the Board determined Z.A. to be disabled and in need of special education services at the June 26, 2013 PPT meeting.  B-2; *see also* Dr. McCarthy Tr. (10/27/14) at 69 ("I don't think there was any question on our team as to whether he was eligible.").  It is also undisputed that the Board did not have in place an IEP for Z.A. at the beginning of the 2013-14 school year.  Therefore, unless there is a sufficient and acceptable reason why the general IDEA requirements for the creation of an IEP for disabled students do not apply to Z.A., the Board failed to offer him a FAPE for the 2013-14 school year.  *See Plainville Bd. of Educ. v. R.N.*, 2012 WL 1094640, at *11 (D. Conn. Mar. 21, 2012) ("an IEP was never developed for the . . . school year. Unless the Board provides an adequate defense, then, a finding that plaintiff failed to provide FAPE for that school year is proper").

The Board offers several arguments as to why its failure to offer Z.A. a day one IEP was defensible: (i) its approach was authorized by IDEA procedure applicable to students who transfer from out-of-state with an existing IEP; (ii) the Board's approach was authorized by a Connecticut regulatory procedure allowing for diagnostic placements pending the creation of an IEP; and (iii) Parents' refusal to consent to an evaluation bars their claim.  The Court addresses these in turn.

### a.    Z.A. as an Out-of-State Transfer Student?

In defending the Board's action, the IHO relied heavily on 34 C.F.R. § 300.323(f), a regulatory provision governing the process by which a disabled student with an IEP relocates to a new school

district in another state during the school year.[15]  Section 300.323(f) states as follows:

> If a child with a disability (who had an IEP that was in effect in a
> previous public agency in another State) transfers to a public agency
> in a new State, and enrolls in a new school within the same school
> year, the new public agency (in consultation with the parents) must
> provide the child with FAPE (including services comparable to those
> described in the child's IEP from the previous public agency), until the
> new public agency—
>
> (1) Conducts an evaluation pursuant to §§ 300.304 through 300.306 (if
> determined to be necessary by the new public agency); and
>
> (2) Develops, adopts, and implements a new IEP, if appropriate, that
> meets the applicable requirements in §§ 300.320 through 300.324.[16]

Section 300.323(f) therefore states that school districts are not obligated to put into effect an IEP that

was operative in an out-of-state district when a student transfers into their district during the school

year.  In such a situation, the Board must only adhere to its general obligation to provide FAPE, while

providing "services comparable" to those offered in the out-of-state IEP pending its initial evaluation

of the student.

     The IHO viewed the Board's action in light of § 300.323(f).  Specifically, she concluded that

---

[15]  The IHO raised 34 C.F.R. § 300.323(f) *sua sponte*.  Neither party discussed it in their
post-hearing briefing.

[16]  Section 300.323(f) largely tracks the statutory language of 20 U.S.C. §
1414(d)(2)(C)(i)(II), which states:

> In the case of a child with a disability who transfers school districts
> within the same academic year, who enrolls in a new school, and who
> had an IEP that was in effect in another State, the local educational
> agency shall provide such child with a free appropriate public
> education, including services comparable to those described in the
> previously held IEP, in consultation with the parents until such time
> as the local educational agency conducts an evaluation pursuant to
> subsection (a)(1), if determined to be necessary by such agency, and
> develops a new IEP, if appropriate, that is consistent with Federal and
> State law.

Z.A. was offered a FAPE because, pursuant to § 300.323(f), "FAPE is provided by offering services comparable to those services provided in the Student's previous IEP until the receiving public agency's IEP team has completed this initial evaluation."  Doc. 29-1, at 10.  The IHO therefore held that the Board was not obligated to provide Z.A. an IEP on day one of the 2013-14 school year because it was allowed an opportunity to place Z.A. in a diagnostic placement given his status as a transfer student with an out-of-state IEP.  Therefore, the IHO held that "GPS did provide FAPE as defined by 34 CFR §323(f) by matching services to those contained in Student's previous Summit School IEP during the period of the diagnostic placement."  Doc. 29-1, at 10.

The IHO erred in its reliance on § 300.323(f), which cannot apply to the case at bar.  By its very terms, it applies only to students transferring from out-of-state who "enroll[] in a new school *within the same school year*."  34 C.F.R. § 300.323(f) (emphasis added); *see also* 20 U.S.C. § 1414(d)(2)(C)(i)(II) (applicable only to children "with a disability who transfer school districts within the same academic year"); *Maynard v. District of Columbia*, 701 F. Supp.2d 116, 123-24 (D.D.C. 2010) ("Given the facts of this case, the Court finds [§ 300.323(f)] inapposite because . . . G.M. transferred schools during the summer, not 'within the same school year.'").  While Parents registered Z.A. with the GPS system during the tail end of the 2012-13 school year, it is undisputed that Z.A. was to finish the school year at Summit and that he would not enroll in a GPS school until the 2013-14 academic year.  Such is acknowledged in the Board's motion papers.  Doc. 29, at 37 n.31 ("the Student was not enrolling in the Greenwich Public Schools until September 2013").  In this instance, where Z.A. was transferring schools during the summer, § 300.323(f) is not applicable.

The Third Circuit has applied the IDEA's *intra*state transfer provision—20 U.S.C. § 1414(d)(2)(C)(i)(I)—to facts somewhat analogous to the case at bar, even though that provision also

only applies for transfers "within the same academic year." In *J.F. v. Byram Township Board of Education*, the court held that "although the transfer here took place between school years, we will apply the test in § 1414(d)(2)(C)(i)(I) because the transfer post-dated the creation of the IEP for the new school year," and therefore "[t]he situation . . . resembles a mid-year transfer." 629 F. App'x 235, 238 n.2 (3d Cir. 2015). However, for the reasons that follow, that analysis is inapplicable to the *inter*state transfer provision of 20 U.S.C. § 1414(d)(2)(C)(i)(II) and actually demonstrates well why the Board cannot invoke it in the instant case.

The IDEA's intrastate transfer provision neither requires or allows for an initial disability evaluation because an intrastate transfer student has already been determined to be disabled under *that state's* standards. In other words, "the child's educational placement has already been determined in accordance with state procedures . . . and his or her IEP bears the imprimatur of that state." *Michael C. ex rel. Stephen C. v. Radnor Tp. School Dist.*, 202 F.3d 642, 651 n.7 (3d Cir. 2000). Therefore, for an intrastate transferor, when an IEP for the forthcoming year has already been put in place, there is no distinction for the school board evaluators between the summer months and the school year. In both situations, neither an initial evaluation or a reevaluation—for purposes of determining disability—need (or may) be conducted.

However, for an *inter*state transferor, the previous IEP carries no imprimatur of correctness in the new state and therefore an initial evaluation must be conducted, even if, as here, the previous IEP was created for a forthcoming school year. In this situation, the distinction between the school year and the summer has significance. During the school year, the receiving school requires the leeway offered pursuant to § 1414(d)(2)(C)(i)(II) because there is little to no gap in time between the operation of the old and the new IEP (if one is determined to be necessary). During the summer

-21-

months, however, where, as here, the receiving school has months to assess the transfer student prior to the beginning of the school year, no leeway is required and the general IEP obligations operate as usual.

The non-applicability of the interstate mid-year transfer provisions is starkly apparent in the case at bar, where the Board had already determined Z.A. to be disabled *pursuant to Connecticut's standards* months before Z.A. was to begin school. The Board had more than sufficient time to create an IEP and needed no stop-gap measure. Viewed in this light, the issue at bar thus is not whether the Board was obligated to put the Summit IEP in effect. In fact, it is quite clear that the Board was not so obligated. *See Michael C.*, 202 F.3d at 651 ("the IDEA's overall scheme and the precedent interpreting that scheme leads inexorably to the conclusion that when a student moves from State A to State B, any prior IEP in effect in State A need not be treated by State B as continuing automatically in effect"). Nor is the issue whether the Board offered Z.A. "comparable services" as to the Summit IEP pending an initial evaluation. Rather, because the Board already determined Z.A. to be disabled and in need of special education and related services under Connecticut's own standards, the issues are simply whether the Board conducted a meeting within thirty days of its determination that Z.A. was disabled, 34 C.F.R. § 300.323(c), and whether the Board had an IEP in effect for Z.A. at the beginning of the school year, 34 C.F.R. § 300.323(a). The Board failed to satisfy both obligations.

The Court understands the dilemma such a scheme imposes on school board's conducting initial evaluations over the summer for disabled transfer students. Pursuant to statute, any initial evaluation of a student must involve "determin[ing] the educational needs of [the] child." 20 U.S.C. § 1414(a)(1)(C)(i)(II). However, as discussed, the IDEA also requires IEPs to be in effect on the first

day of the school year for any student determined to be disabled.   34 C.F.R. § 300.323(a). Accordingly, where a school board initially determines a student to be disabled over the summer months, it will generally have to determine the educational needs of that child without ever being able to evaluate the student within its own school-year program: the purpose of the so-called "diagnostic placement."   However, such is the statutory scheme in effect.   Further, the Second Circuit has stated forcefully that Parents of disabled children have a "considerable reliance interest[]" in an IEP being created prior to the start of the school year because "[a]t the time the parents must choose whether to accept the school district recommendation or place the child elsewhere, they have only the IEP to rely on."   *R.E.*, 694 F.3d at 186.   In line with this authority, the Board was obligated to do its best to evaluate Z.A.'s educational needs over the summer and create an IEP prior to the start of the school year.   In other words, as in *Maynard*, where § 300.323(f) was not applicable due to a disabled student's interstate summer transfer, the Board was "required to develop its own IEP for [the student] prior to the start of [the following] school year."   701 F. Supp.2d. at 124.

In light of the foregoing, Z.A.'s status as an interstate transfer student could have no effect on the Board's requirement that it have an IEP prepared for Z.A. on day one of the 2013-14 school year.[17]

---

[17] Moreover, even assuming, *arguendo*, that § 300.323(f) does apply, the Board failed to adhere to its terms.   The services in place pursuant to that regulation must be "services comparable to those described in the child's IEP from the previous public agency."   On the Board's own submission, it did not offer Z.A. services comparable to his Summit IEP at the June 26, 2013 PPT meeting.   This is evidenced best by the chart created by Hoette for the September 17, 2013 meeting.   That chart clearly demonstrates substantive distinctions between the services provided pursuant to the Summit IEP and those offered at the June 26, 2013 PPT.   For example, at Summit, Z.A. received occupational therapy twice weekly, but, pursuant to the June 26, 2013 PPT, occupational therapy was "[n]ot part of the diagnostic."   B-4.   And, to the extent the Board or the IHO relied on services offered for the first time at the September 17, 2013 PPT in determining which comparable services were offered, it erred.   Those services were offered after Parents had to decide where Z.A. would begin the school year.   Reliance on that diagnostic placement is foreclosed by *R.E.*, 694 F.3d at 186.

b.      **Diagnostic Placement**

The Board argues that a Connecticut regulation, RCSA § 10-76d-14, allowed it to forestall

imposition of an IEP pending a "diagnostic placement" of Z.A.  That regulation states in relevant part:

> *Each board of education may use trial placement for diagnostic*
> *purposes as part of the initial evaluation or reevaluation of a child.*
> This shall mean a structured program, of not more than forty school
> days duration, *the purpose of which is to assess the needs of a child*
> *who is* or may be *a child with a disability, but for whom* the evaluation
> or reevaluation is either inconclusive or *the data insufficient* to
> determine the child's eligibility for special education and related
> services or *to develop* or revise *the child's individualized education*
> *program.*

RCSA § 10-76d-14 (emphases added).  Relying on a reading focused on the language emphasized

above, the Board makes the following argument: it was entitled to delay creation of an IEP and

impose a temporary diagnostic placement, despite the fact that it had sufficient data to determine that

Z.A. was disabled, because without evaluating Z.A. in its mainstream school-year program, it had

insufficient data "to develop . . . [Z.A.]'s individualized education program."

The IHO accepted this argument, finding the Board's process of review permissible because

"RCSA 10-76d-4 [*sic*][18] provides that a board of education may use trial placement for diagnostic

purposes as part of the initial evaluation of a child."  Doc. 29-1, at 9.  At the outset, the Court notes

that that determination relied in part on the IHO's earlier finding that the "evaluation referenced in §

300.323(f) is considered an 'initial evaluation' for the new public agency."  Doc. 29-1, at 9.  However,

as discussed *supra*, the Board was not conducting an evaluation pursuant to § 300.323(f).  Further,

---

[18]   The reference to RCSA § 10-76d-4, a provision regulating the physical facilities and
equipment to be used in providing special education and related services, was clearly a
typographical error.  The IHO certainly meant to refer to RCSA § 10-76d-14, which, as
discussed, governs trial placements for diagnostic purposes.

the Board had already completed the main task of an initial evaluation:  determining whether the

student is disabled.  It needed no diagnostic placement to make that determination.

     In any event, the Board's argument that RCSA § 10-76d-14 allowed it wait to conduct a

diagnostic placement of Z.A. during the school year, with no IEP in place, cannot be reconciled with

the language of the IDEA and its implementing regulations.[19]  34 C.F.R. § 300.323(a) states expressly

that "*[a]t the beginning of each school year*, each public agency *must have in effect*, for each child

with a disability within its jurisdiction, an IEP."  Here, the Board does not even argue that its

diagnostic placement constituted an IEP.  Nor could it.[20]  And, as discussed, the Second Circuit has

identified a significant interest that parents of disabled children have in obtaining a proposed IEP

prior to the date by which they must decide where to send their child for a given school year:

> The Supreme Court has long recognized that the IDEA allows parents
> to reject an IEP they feel is inadequate, place their child in an
> appropriate private school, and seek tuition reimbursement from the
> school district. . . .  *In order for this system to function properly,*
> *parents must have sufficient information about the IEP to make an*
> *informed decision as to its adequacy prior to making a placement*
> *decision.*  At the time the parents must choose whether to accept the
> school district recommendation or to place the child elsewhere, they
> have only the IEP to rely on, and therefore the adequacy of the IEP

---

[19]  The Board cites to *Bethel Board of Education* to make the argument that a school
board can put in place during the summer a diagnostic placement that will only begin at the start
of the next school year.  *Bethel* does not help the Board.  There, unlike here, the diagnostic
placement was itself an IEP.  *See, e.g.*, Doc. 29-4 ¶¶ 45 ("[t]he diagnostic *IEP* included goals and
objectives and identified the following services . . .") (emphasis added).  The IHO herself
determined that the document created out of the PPT meeting here was "not an IEP. . ..  This is a
diagnostic placement."  (10/27/14) at 60.

[20]  As discussed, *supra* n.21, the IHO herself stated that the Board's diagnostic placement
was "not an IEP."  (10/27/14) at 60.  In addition, the diagnostic placement document did not
contain most of the required elements of an IEP as defined in 34 C.F.R. § 300.320.  For example,
the first requirement is that the IEP include "[a] statement of the child's present levels of
academic achievement and functional performance."  34 C.F.R. § 300.320(a).  Such is entirely
absent from the diagnostic placement plan.

itself creates considerable reliance interests for the parents. Under the Department's view, a school district could create an IEP that was materially defective, causing the parents to justifiably effect a private placement, and then defeat the parents' reimbursement claim at a *Burlington/Carter* hearing with evidence that effectively amends or fixes the IEP by showing that the child would, in practice, have received the missing services. The Department's view is incorrect. By requiring school districts to put their efforts into creating adequate IEPs at the outset, IDEA prevents a school district from effectuating this type of "bait and switch," even if the baiting is done unintentionally.

*R.E.*, 694 F.3d at 186 (internal citations omitted).

In the face of this forceful expression, RCSA § 10-76d-14 cannot be read to provide a school board a general right to make parents of a disabled child forego the creation of an IEP for a student that it determines to be disabled well prior to the start of a school year, and instead offer that student a temporary placement, even for seemingly salutary "diagnostic" purposes. To hold otherwise would force parents of disabled children, such as Plaintiffs here, to make a placement decision without the benefit of having any knowledge as to how their disabled child would be dealt with throughout the substantial majority of the entire school-year to follow. In fact, this was the precise concern shared by Mrs. A. at the due process hearing when she was asked by the Board's counsel: "if [the school] felt that . . . a support [Z.A.] had during the diagnostic placement was appropriate, they could keep that support is that correct?" Mrs. A. Tr. (10/21/14) at 85). Mrs. A. responded: "Right, but I couldn't risk them not." Mrs. A. Tr. (10/21/14) at 85. Forcing Mrs. A. to take that risk contrasts with the approach of the IDEA and binding case law.

### c.    Parents' Refusal to Allow Z.A. to be Evaluated?

The Board next argues that Parents' refusal to allow it to evaluate Z.A. blocks Parents' claims. In essence, the Board argues that it was unable to meet its obligation to have an IEP for Z.A. on day

one of the school year because of Parents' refusal to allow it to evaluate Z.A.

The Board is correct that it had not just a right, but an obligation, to evaluate Z.A. prior to providing him special education services. *See* 20 U.S.C. § 1414(a)(1)(A) (a "local educational agency shall conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability."). The Board is also correct that reimbursement for a private placement may be forfeited where parents refused to make their child available for evaluation by the reviewing school board. *See P.S. v. Brookfield Bd. of Educ.*, 353 F. Supp.2d 306, 314-15 (D. Conn. 2005) ("Because the Board was entitled to perform the requested evaluation, P.S.'s parents lost their right to reimbursement by failing to make P.S. available for that evaluation").

However, the Board's argument fails on this record. At the outset, the record demonstrates that Parents did not refuse consent for any relevant evaluation apart from the diagnostic placement itself. As testified to by CMS school psychologist Dr. McCarthy, the PPT did not offer to conduct any evaluations of Z.A. prior to the start of the school year. Dr. McCarthy Tr. (10/27/14) at 13; *see also id.* at 130 (agreeing that "[a]t the June PPT meeting . . . none of the Greenwich members of the team recommended that any evaluations be conducted of [Z.A.]"). Nor does the June PPT meeting's "Action Proposed" section identify any type of evaluation of Z.A. that would occur prior to the start of the school year. B-3. And, because the diagnostic placement was only to begin at the start of the school year, Parents' refusal to consent to that placement cannot, as a matter of law, have constituted an obstacle to the Board's ability to draft a compliant IEP. As discussed above, any compliant IEP needed to be in effect *prior* to the start of the school year.

Moreover, any refusal on the part of the Parents to allow the Board to evaluate Z.A. during

the summer—including the Parents' supposed refusal to allow Board members to visit Z.A. at home or at summer camp—was not the reason that there was no IEP in place for the start of the school year. Rather, the record makes clear that the animating purpose of the diagnostic placement was to determine whether Z.A. could operate in a mainstream setting, which, as a matter of course, would be determined only by placing him in such a setting at the beginning of the school year. Given this reality, it was the Board's position that there was no information that an evaluation could have elicited that would have led it to alter its diagnostic placement approach:

> Q: Wouldn't evaluating [Z.A.] prior to the start of the school year have given the PPT an opportunity to gather more information about him even before he entered a completely new school?
>
> A: I think the PPT felt that they had enough information.
>
> Q: If they had enough information, then why wouldn't the PPT just develop an IEP?
>
> A: The PPT felt that the goals and objectives were appropriate, and that the information we had from the people who were giving us information was current, and the question, as I had testified to before, about the diagnostic, was more regarding the service delivery of those – of how best would [Z.A.] be able to access those goals and objectives within the mainstream setting.

Dr. McCarthy Tr. (10/17/14) at 13; *see also id.* at 22 ("Q: . . . [Y]ou felt the team believed that it had enough information about [Z.A.] so it wasn't necessary to conduct further evaluations, correct? A: Correct."). Dr. McCarthy reiterated his position, making it more than clear that the PPT saw no benefit to a further evaluation prior to the start of the school year:

> I think we had enough information. We weren't looking to use the diagnostic placement to determine a placement question. *I don't think that if I could have done anything in that moment, it would have been to do an evaluation* to see, to have him come into the building and look at the school and go through a school day, and there wouldn't really be an evaluation that we could conduct just, you know, signing

for consent to conduct an evaluation to the summer. *We were looking to kind of evaluate that question through the diagnostic placement.* So, we had enough information to plan for that, but wanted to look at the placement – if that makes sense.

Dr. McCarthy Tr. (10/27/14) at 24 (emphasis added).[21]

Parents' actions therefore played no role in the Board's failure to meet its statutory obligation to have an IEP prepared for Z.A. on day one of the 2013-14 school year. This bars the Board's argument. The Board itself acknowledges that "'it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, *when that failure was the result of [the parents'] lack of cooperation*.'" Doc. 29, at 29 (quoting *M.M. v. Sch. Dist.*, 303 F.3d 523, 535 (4th Cir. 2002)) (alteration by the Board, emphasis by the Court). Here, as discussed, the failure to have an IEP on day one was a result of the Board's inflexible commitment to evaluating Z.A. in a mainstream setting only at the start of the school year. That is to say: even assuming, *arguendo*, Parents' failure to fully cooperate with the Board's evaluative process, the Board's claim fails on this record. The Board has not shown that any manifestations of Parents' failure to cooperate impacted its ultimate decision to forego creating an IEP for the start of the school year. The Board's argument with respect to Parents' alleged refusal to consent to an evaluation is without merit.

In light of the foregoing, the Board has offered no defense to its failure to meet its obligation to have an IEP for Z.A., an undisputedly disabled child, in effect on day one of the 2013-14 school year. Accordingly, the Board failed to offer Z.A. a FAPE for that year. The first element of the

_____

[21] This analysis also forecloses any argument that Parents' temporary declination of the Board's July 10, 2013 offer to hold a second PPT bars their claims. The Board made clear that its plan was not to craft an IEP at that second PPT meeting when it refused to do so when that meeting ultimately convened in September 2013. Accordingly, the Board's offer to convene a second PPT in mid-July 2013 cannot be construed as an attempt to have an IEP in place within thirty days following its disability determination, as was required by 34 C.F.R. § 300.323(c).

*Burlington/Carter* test is met.

### 2.      Appropriateness of Eagle Hill

To be eligible for reimbursement under the IDEA, Parents must have established that Eagle

Hill was an appropriate placement for Z.A.:

> [U]pon a finding that a public agency's placement or program or proposed placement or program is not appropriate, any party seeking reimbursement for a unilateral placement or program shall prove the appropriateness of such placement or program by a preponderance of the evidence.

RCSA § 10-76-14(c).  A unilateral private placement is only appropriate if the "placement provides

educational instruction specially designed to meet the unique needs of a [disabled] child, supported

by such services as are necessary to permit the child to benefit from instruction." *C.L. v. Scarsdale*

*Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014) (internal citations and quotations omitted).

"In making this determination, courts look to the 'totality of the circumstances' and '[n]o one factor

is necessarily dispositive.'" *M.B. ex rel. L.C. v. Minisink Valley Cent. Sch. Dist.*, 523 F. App'x 76, 78

(2d Cir. 2013) (quoting *Frank G.*, 459 F.3d at 364).  In short, the "parents' placement of the child must

be reasonably calculated to enable the child to receive educational benefits."  *C.L.*, 744 F.3d at 836.

Finally, "'the test for the parents' private placement is that it is appropriate, and not that it is perfect.'"

*Regional Sch. Dist. No. 9 Bd. of Educ. v. Mr. and Mrs. M.*, 2009 WL 2514064, at *14 (D. Conn. Aug.

7, 2009) (quoting *Warren G. v. Cumberland Cnty Sch. Dist.*, 190 F.3d 80, 84 (3d Cir. 1999)).

Given her finding that the Board offered Z.A. a FAPE for the 2013-14 school year, the IHO

found "no need to address the issues related to [the appropriateness of Parents' private] placement."

Doc. 29-1, at 10.  For the reasons stated *supra*, that finding was erroneous.  Having no agency

decision with which to defer, the Court makes this determination *de novo*.[22]

The Board argues that Parents failed to meet their burden of proving the appropriateness of Eagle Hill.  It argues principally that "the record is devoid of any evidence regarding the specific individualized programming, other than one social skills class per week, provided to the Student at Eagle Hill School."  Doc. 29, at 24.  It contends that evidence regarding Eagle Hill generally is insufficient to demonstrate Eagle Hill's appropriateness specifically with respect to Z.A.  The Board also argues that the record demonstrates Z.A. actually regressed at Eagle Hill, further evincing Eagle Hill's inappropriateness for Z.A.

The Board is wrong in claiming that Parents offered no evidence of Z.A.'s specific programming at Eagle Hill.  Parents submitted two "advisor reports" from Eagle Hill, one from December 2013 and the other from June 2014.  P-12; P-13.  Eagle Hill explained to Parents the content of these advisor reports as follows:

> Twice a year, in December and June, teachers and advisors prepare
> written reports, which are designed to provide you with information
> regarding your child's program at Eagle Hill.  These reports are
> comprised of several sections, each designed to provide you with

---

[22]  The IHO did make one factual finding related to Eagle Hill: "There was no evidence at the hearing that Eagle Hill's clinical services were different from or more appropriate than the services available through CMS clinical and special educational staff."  Doc. 29-1, at 7.  The Court notes that this finding is largely irrelevant as to the appropriateness of Eagle Hill as a private placement under the IDEA.  Under that analysis, Parents need make no relative showing with respect to the placement offered by the Board.  They only must show that Eagle Hill is an appropriate placement.  This is made clear in light of the fact that "[a]n appropriate private placement need not meet state education standards or requirements," and therefore "parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a free appropriate public education."  *Frank G.*, 459 F.3d at 365; *see also A.D. ex rel. J.D. v. N.Y.C. Dep't of Educ.*, 2008 WL 8993558, at *6 (S.D.N.Y. Apr. 21, 2008) ("the standard applied to determine the appropriateness of parental placement is less restrictive and subject to fewer constraints than that applied to the school authorities" (internal quotation omitted)).

information about your child's day-to-day performance.

The **advisor report** is designed to provide you with information regarding your child's general involvement in the program, including social interaction, learning style and metacognition and class room performance.

Classroom reports are composed by your child's teachers and contain information about the units instructed in class, materials used, the grade level of reading material, and samples of reading, spelling, and vocabulary terms. They also include a scope and sequence of skills instructed in a particular class. These skills are rated to provide you with a clear picture of those your child can independently apply, those that still require on-going instruction and guidance, as well as modifications that teachers use to optimize your child's academic performance. You will find a classroom report for each subject your child is enrolled in at Eagle Hill.

Following that summary sent to Parents is a detailed and lengthy document regarding the specifics of Z.A.'s program at Eagle Hill. Specifically, the report breaks down in detail Z.A.'s program and performance separately as to his tutorial, math, writing, science, literature, and study skills classes, as well as his "collaborative speech and language program." P-12, at 1. Parents then offered the testimony of a former Eagle Hill speech and language pathologist, who spent seven years at Eagle Hill and who testified in detail as to the specific programming identified in the advisor reports, followed by an identification of Z.A.'s specific programming. Rosenberg Tr. (10/8/14) at 7-8, 11-38, 45-47. Mrs. A. also testified as to other aspects of Eagle Hill's program specifically in relation to Z.A. For example, she testified that Z.A.'s program at Eagle Hill is structured (*i.e.*, monitored by an adult) throughout the entire school day and that Eagle Hill offers Z.A. a support person available for him on an as-needed basis. Mrs. A. Tr. (10/21/14), at 75, 97. It is hard to imagine more detailed evidence as to Z.A.'s specific programming at Eagle Hill.

Moreover, Parents also offered significant testimony that the programming at Eagle Hill is

appropriate to address Z.A.'s specific learning disabilities.  For example, Mrs. A. testified that Eagle

Hill was initially recommended to her by Dr. Morrel, who had intimate knowledge of Z.A.'s learning

disabilities and needs and was familiar with Eagle Hill. *Id.* at 33.  Further, Dr. Rahtz came to the

following conclusion after speaking with Eagle Hill representatives specifically with respect to Z.A.

prior to Parents' decision to enroll him there:

> [I]n those discussions it became quite clear to me that, in my opinion,
> [Eagle Hill] was quite capable of responding to [Z.A.]'s stresses and
> difficulties in a very skillful, sensitive, and flexible way that addressed
> his emotional difficulties.

Dr. Rahtz Tr. (9/4/14) at 17.  It was Dr. Rahtz's "overall impression . . . that [Eagle Hill] made

significant efforts to prepare their curriculum, their support techniques, prior to [Z.A.] arriving at the

school." *Id.* at 30.  In fact, Dr. Rahtz testified that Eagle Hill

> did a better job [than Summit, Z.A.'s previous private placement] in
> terms of the skill levels and sensitivity levels and flexibility of
> addressing [Z.A.]'s needs, both emotionally and psychologically as
> well as academically, so that they . . . had the capacity to tailor his
> activities, particularly the less-structured activities, in a way that was
> supportive of [Z.A.] and understood some of the implications of his
> difficulties with self esteem, competition, rivalry with peers, that really
> needed a refined approach which they were able to deliver.

*Id.* at 18-19.  Similarly, Dr. Heitzman reported that Eagle Hill "seems to best match [Z.A.'s] level of

need based on the findings of this evaluation." B-7, at 13.  Mrs. A. also testified that Dr. Anne

McBride, a psychopharmacologist at New York Presbyterian hospital "felt [that Eagle Hill] was an

appropriate place for [Z.A.].  She has other patients that have gone there and she felt like it was a

really good fit for him." Mrs. A. Tr. (9/4/14) at 68.  Moreover, Eagle Hill's then speech and language

pathologist testified as to her heart-warming reaction upon initially realizing that Eagle Hill was a fit

and proper placement for Z.A.:

> I'm smiling because I still remember the day [of Z.A.'s initial
> screening] – I still remember coming out and being like, what a great
> day, you know, and thinking absolutely appropriate. Excuse the word,
> but like a little quirky fits in just perfectly with a segment of our kids,
> and I thought it was a great match.

Rosenberg Tr. (10/8/14) at 69-70.  Mrs. A. also testified that "everything is better with [Z.A.] after

this year at Eagle Hill in ways that I hoped it would be."  Mrs. A. Tr. (7/24/14) at 62.  This is

confirmed by Eagle Hill's advisor reports, which stated that Z.A. "continues to benefit greatly from

the small class size, structure and nurturing environment here at Eagle Hill School."  P-12, at 2.

It may not be surprising to learn that Eagle Hill administrators think Eagle Hill is a fine

placement for Z.A.  Nonetheless, the record evidence from several sources establishes that Parents

demonstrated by a preponderance of the evidence that Eagle Hill is reasonably designed to meet the

specific special educational needs of Z.A.  Further, the Court notes that the Board offered no credible

evidence that Eagle Hill is for any reason inappropriate to Z.A.'s needs.[23]  *See Matrejek v. Brewster*

*Cent. Sch. Dist.*, 293 F. App'x 20, 22 (2d Cir. 2008) (affirming school district's determination that

private placement was inappropriate in light of, *inter alia*, testimony that the private placement "did

not provide the type of instruction and services recommended by the evaluators hired by the

parents").[24]  Therefore, the Court finds that Parents established the appropriateness of Eagle Hill by

_____

[23]  Its only attempt to do so is to point out that Z.A.'s percentile ranking with respect to
reading accuracy and comprehension dropped from the fall of 2013 to the spring of 2014, and
that Eagle Hill and Summit evaluated Z.A.'s reading ability differently.  Doc. 29, at 29 (citing P-
12, at 29 and B-2, at 1).  The Board cannot overcome Parents' showing that Eagle Hill is
reasonably calculated to lead to educational benefits by cherry-picking two discrete metrics by
which Z.A. may have regressed at Eagle Hill.  This is especially so where there is other specific
evidence of Z.A.'s progress at Eagle Hill.  *See*, *e.g.*, Rosenberg Tr. (10/8/14) at 52; P-12.

[24]  The Court is mindful that parents have the burden of persuasion as to the
appropriateness of a private placement, and that local education agencies are under no obligation
to provide any affirmative evidence demonstrating the inappropriateness of a private placement.
However, here, when confronted with Parents' credible demonstration of the specific

a preponderance of the evidence.

### 3. Equitable Considerations

The third prong of the *Burlington/Carter* test has the Court assess whether Parents can properly show that "equitable considerations favor reimbursement." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014). A "district court enjoys broad discretion in considering equitable factors relevant to fashioning relief." *Gagliardo*, 489 F.3d at 112. Relevant here and "[i]mportant to the equitable consideration is whether the parents obstructed or were uncooperative in the school district's efforts to meet its obligations under the IDEA." *C.L.*, 744 F.3d at 840.

As discussed below, the Board argues that Parents were determined from the beginning to send Z.A. to Eagle Hill and, in line with that intent, interfered with the Board's evaluative process. It then argues that Parents' lack of cooperation precludes reimbursement.

Given her mistaken finding that the Board offered Z.A. a FAPE, the IHO made no ultimate decision as to whether the equities bar Parents from reimbursement. However, she did make certain findings evincing her position on the issue. Most notably, she stated as follows:

> The Mother's noncommital response [to the Board's offer to observe Z.A. over the summer] reveals that she had in fact already made the determination that Student would not need to meet GPS staff because Student would not be attending CMS in the fall of 2013. . . .

> The Mother's conduct raises troubling questions of whether the Parents had ever intended for the Student to attend a Board school when Mother registered the Student, and what the Parents' ultimate purpose is in filing this Due Process Complaint seeking reimbursement for tuition and education related expenses.

---

appropriateness of the private placement, the Board cannot win without rebutting that showing.

Doc. 29-1, at 8.

However, the Court notes that such considerations, on their face, should have little impact on the equitable analysis authorized by the IDEA.  In short, Parents' subjective intent as to whether they "ever intended for the Student to attend a Board school," untethered to a relevant manifestation of that intent, is irrelevant.  As discussed by the Second Circuit:

> [Parents'] pursuit of a private placement was not a basis for denying their tuition reimbursement, even assuming . . . that the parents never intended to keep C.L. in public school for the 2008-09 school year.

*C.L.*, 744 F.3d at 840.  The Court of Appeals' declaration makes eminent sense (if I may say so with due respect).  When considering the equities in an IDEA dispute, the adjudicator has already determined that a school board violated parents' statutory rights.  Here, that violation meant that Z.A. was denied a FAPE by the Board, which would generally require the Board to cover the costs of Parents' privately secured education.  There is no discernible reason why parents' internal unexpressed wishes or intent about the outcome of the IDEA process should preclude them from that statutory remedy.  Rather, those wishes or intent should carry relevance as to the equitable analysis only where they accompany or cause overt acts or omissions that hindered the Board from meeting its statutory obligation in the first place.  *See Warren G. ex rel. Tom G. v. Cumberland Cnty Sch. Dist.*, 190 F.3d 80, 86 (3d Cir. 1999) (reversing a denial of reimbursement where it was "undisputed that the District failed to come forward with appropriate IEPs and there is no finding that the parents' conduct obstructed its ability to do so").  For example, in *Bettinger v. N.Y.C. Board of Education*, Judge Crotty rejected reimbursement on equitable grounds because the "IDEA does not allow parents to unilaterally select a school of preference for their child, enroll him, *and then frustrate the City's placement system* in order to gain tuition reimbursement for their school of choice from the courts."  2007 WL 4208560,

at *9 (S.D.N.Y. Nov. 20, 2007) (emphasis added); *see also M.S. v. Mullica Twp. Bd. of Educ.*, 485

F. Supp.2d 555, 568 (D.N.J. 2007) (holding reimbursement to be inappropriate where parents "refused

to cooperate with the [local education agency] to such an extent that the [agency] was unreasonably

prevented from creating an IEP"). The remaining cases cited by the Board discussing whether parents'

obstructive actions warrant a reduction of relief on equitable grounds likewise involved actions that

in some way hindered the Board in meeting its statutory obligation.[25]

It follows from cases such as these that, in order for equitable considerations to bar

reimbursement in this case, there must have been an act or omission on the part of Parents that in

some way obstructed the Board's provision of a FAPE to Z.A. The Board's attempt at this is as

follows: "Parents interfered with the cooperative process by refusing to allow the Board to get to

know and understand the Student's current functioning." Doc. 29, at 37. The Board's examples are

as follows: (i) Parents taking Z.A. to visit Eagle Hall in February 2013 but making no effort to visit

CMS; (ii) failure to inform the Board that Z.A. was being evaluated in Connecticut by Dr. Heitzman

in May and June 2013; (iii) failing to accept the Board's offer to observe Z.A. at summer camp or at

home; (iv) temporarily declining the Board's July 2013 offer to convene a second PPT; (v) deciding

same prior to the issuance of Dr. Heitzman's report; (vi) making a non-refundable deposit to Eagle

---

[25] *See*, *e.g. Frank G.*, 459 U.S. at 376 (discussing relevance of parents' provision of notice to the board as to their private placement election and distinguishing case in which no notice was given prior to removal because where notice was given "the School District had every opportunity to evaluate [the Student]"); *S.W. v. N.Y.C. Dep't of Educ.*, 646 F. Supp.2d 346, 363 (S.D.N.Y. 2009) ("S.W. was required to provide adequate notice to the school district *so that it could be given the opportunity to devise a FAPE*" (emphasis added)); *T.M. ex rel. T.D.M. v. Kingston City Sch. Dist.*, 891 F. Supp.2d 289, 295-96 (N.D.N.Y. 2012) (parents' actions "unreasonably prevented the District from making a proper determination as to T.D.M.'s graduation status or developing an updated IEP. . . . Had the District obtained the transcript [from parents] in June 2008 when it was first requested, it would have been clear that T.D.M. had earned a Regents diploma—thus ending the District's obligation to provide him with a FAPE").

Hill and asserting it does not evince intent for Z.A. to enroll there; (vii) failing to date properly the Eagle Hill contract; and (vii) failure to consent to the diagnostic placement.

Even accepting that each of the above occurred as stated by the Board, none of those acts or omissions actually obstructed the Board in meeting its obligations to provide a FAPE. The actions with respect to Eagle Hill do demonstrate that Parents likely had a strong desire for Z.A. to attend Eagle Hill rather than CMS. This is made most clear by Parents' commitment to pay the entire year's tuition prior to registering Z.A. with GPS. Further, the Court would have to defer to the IHO's determination that Z.A.'s mother was not credible when she testified that she was genuinely amenable to Z.A. attending CMS. However, as discussed, Parents' intent is not relevant *per se.* Her actions with respect to Eagle Hill complied with statutory notice obligations and in no way could have hindered or did hinder the Board's ability to create an IEP for Z.A.

On the other hand, the other instances identified by the Board could, in theory, have obstructed the Board's ability to evaluate Z.A. If Parents did not allow the Board to observe Z.A. at home or at summer camp, the Board had less ability to evaluate Z.A. and determine his needs. The same might be said about Parents' failures to bring Z.A. to CMS in February 2013 and to inform the Board about the forthcoming report from Dr. Heitzmann.

However, that these acts *could* have hindered the Board's ability to learn about Z.A. is irrelevant in light of the Board's acknowledgment—discussed at length, *supra* at 27-29—that no further evaluation would have led it to implement an IEP by the start of the 2013-14 school year. In other words, none of Parents' actions had any causal role in the Board's failure to provide a FAPE. Parents' delayed disclosure of Dr. Heitzmann's evaluation is a notable example. Although Parents could have been more forthcoming about this report, when they ultimately provided said report to the

Board, the Board still decided against creating an IEP, a decision contravening the IDEA for the reasons discussed, *supra*. In addition, there is little in the record to demonstrate that Parents refused to comply with affirmative requests from the Board. In fact, the only purported refusal of a Board request made prior to the start of the school year is what the IHO determined was a "non-committal" response to requests made at one meeting in June 2013. These one-off requests were apparently not of enough significance to the Board to be included in the "Actions Proposed" section of the PPT minutes, nor is there any evidence that the Board ever followed-up with those requests. The only other less than affirmative response to a pre-school year request was to the Board's offer to have a second PPT convened. However, Parents ultimately agreed to the second PPT, which, when convened, arrived at an outcome that again failed to comply with the IDEA. Where, as here, the Board's statutory violation stands on its own and cannot be excused or explained by any conduct of the parents, relief for that statutory violation should not be limited by equitable considerations.

In sum, it cannot be disputed (i) that Parents gave the Board all of the information that they were required to provide, (ii) that the Board acknowledges that what Parents provided was sufficient for its pre-school year evaluation purposes; and (iii) that the Board acknowledges that no other information or evaluation prior to the school year would have led it to act differently such that it complied with the IDEA. Nor does the Board assert that Parents failed to comply with any IDEA statute or regulation. In such a situation, a reimbursement award should not be limited on equitable grounds.

Parents are entitled to advocate fiercely, even overzealously, on behalf of their disabled children's interests. They are also entitled to disagree with a local education agency's determination as to how those interests would be best served. And, when that agency's process in protecting those

interests contravened applicable law, those parents are generally entitled to relief.  Parents should not be stripped of that entitlement as long they operate within the rules and do not hinder the agency in its performance of its statutorily-required function.  Such is the case at bar.  Parents' entitlement to relief for the Board's violations of the IDEA shall not be reduced in light of equitable considerations.

### B.    Section 504 of the Rehabilitation Act

Parents assert in their opening brief in support of their summary judgment motion that they are entitled to relief on "the second count of their Complaint, alleging a violation by Defendant of Section 504 of the Rehabilitation Act of 1973." Doc. 26, at 2.  The problem with this argument is that Parents' operative complaint contains no second count, nor does it make any reference to the Rehabilitation Act.[26]  The Board identified this deficiency in its cross-motion for summary judgment. Doc. 29, at 40.  Parents' offer no response in their opposition.  Nor is any apparent.  To the extent Parents proffer a claim under Section 504 of the Rehabilitation Act of 1973, it is dismissed.

## IV.    Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [Doc. 25] is GRANTED, and Defendants' Cross-Motion for Summary Judgment [Doc. 28] is DENIED in part, and GRANTED only to the extent of dismissal of any purported claim brought pursuant to the Rehabilitation Act.[27] The Clerk of Court is directed to enter judgment for Plaintiffs.  As a result of the foregoing, the IHO's decision is hereby REVERSED, and Defendant is hereby ordered to pay Plaintiffs the full tuition reimbursement and related costs for Z.A.'s attendance at Eagle Hill for the 2013-14 academic year.

---

[26]  Parents did bring such a claim in their initial complaint, styled as "Count Two."  Doc. 1 ¶¶ 70-76.  This count is not included in their amended complaint.  Doc. 13.

[27]  The parties have also filed respective motions to seal the documents comprising the administrative record in this case.  Docs. 30, 34.  These motions are granted.

Since the Plaintiffs/Parents have prevailed in this action brought under the IDEA, they may ask the Court to "award reasonable attorneys' fees as part of the costs." 20 U.S.C. § 1415(i)(c)(3); *see Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006).  If they are so advised, Plaintiffs will be required to file, on or before August 12, 2016, proof of their reasonable attorneys' fees.  Plaintiffs should submit documentation of their contemporaneous attorneys' records detailing the legal services provided, including "for each attorney, the date, the hours expended, and the nature of the work done." *New York Ass'n of Retarded Children v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983).  The parties should bear in mind that the Court is required to conduct a "'lodestar' analysis, which calculates reasonable attorneys' fees by multiplying the reasonable hours expended on the action by a reasonable hourly rate." *Kroshnyi v. U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 108 (2d Cir. 2014); *see also Blanchard v. Bergeron*, 489 U.S. 87, 96 (1989) ("It is central to the awarding of attorney's fees . . . that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case").  Defendant will be entitled to respond to any such submission within fourteen (14) days of its filing.

**It is SO ORDERED.**

**Dated: New Haven, Connecticut**
**July 21, 2016**

          */s/ Charles S. Haight, Jr.*
        **Charles S. Haight, Jr.**
        **Senior United States District Judge**

-41-